Our next case for argument is 23-1389, Wuhan v. ITC Please proceed Good morning, Your Honor. May it please the Court I intend to address the infringement and economic issues in the order they were briefed but of course, I'll go wherever Your Honors want to take me There are two questions that the Court needs to address for the infringement issues The first one is whether the aggregate content for Healthgen Wuhan Healthgen is the name of the party, but the party I'm referring to is Healthgen Whether that clinical product, whether the aggregate content of that clinical product materially changes from the date it's manufactured in China to when it arrives in the United States The second issue the Court needs to address is whether reducing SDS page materially decreases, artificially decreases the aggregate content in those samples before they're actually measured Suppose in this appeal, in the entire ITC proceeding, there never was a reducing SDS page That data never came into the case, never even entered the picture How would you address the presence or absence of substantial evidence based strictly on the testing in China and then what's in the record about what happens during shipping? Well, I think in that case, we'd have a much more difficult time You have an expert on Ventria's side who says, well, yes, it can increase during shipment Yes, it can increase during storage, but it shouldn't And an expert on our side who says, no, it will inevitably increase during storage and shipment But you have their testing, Ventria's own testing, which shows without a doubt that it actually did increase So the expert's speculation on what... It's interesting the way you're presenting that because in my mind, when I think about substantial evidence I think I can just delete something from the record and focus on one part of the record If that one part is substantial evidence, then I'm done I don't have to think about this other part of the record that's controversial But it sounds like you're suggesting that I should think about the reducing because it actually erodes the other evidence No, I'm not saying you should or can ignore that expert testimony But that expert testimony only goes so far In theory, it ought not to make a difference unless you have some kind of event that causes aggregation to occur But here we know aggregation actually did occur So that expert's speculation on what might occur is no longer... There needs to be some other explanation for what happened here We are faced with their own evidence which shows unquestionably that that aggregate content increased in the 9 months Between when it was made in China and when it arrived in the United States To 1.81% Yeah, and that is certainly an undercount And we know it's an undercount because again, their own expert says that the reducing SDS page test that they used There's a pretreatment step that's used that is designed to break apart aggregates before the measurement is made And so their own expert at 1468 in the record, appendix 1468 I'll quote from it It says that when you do reduce the SDS page You're going to have an artificially lower number or percent of aggregated albumin Right, and so on page 49 of your brief, you've got this demonstrative probably from the hearing And in the middle, on the left you've got the 1.1% in China On the right you've got the 1.81% at the border or wherever that was In the middle, a number that you believe to be higher based on what you just said about how reducing SDS page works But it's got question marks there Yeah How do you know that the question marks are not under 2%? Well, so it's their burden of proving the question marks were under 2% It is It is That's a great question Tell me more about why that's their burden to go that far and prove what the question marks are Okay, so let me take one step at a time Well first, the claim construction says it's got to be below 2% So one step at a time The Biogen case first talks about why the test in China can't be used And so that 1.81% is useful for showing, unquestionably, that property materially changes From the time it's made in China to when it's imported I got lost when you said that there's a case called Biogen that says we can't use the 1.1 value in the China test You can use data generated overseas As long as that data generated overseas is representative of the product in the United States And we know from that 1.81% What if the evidence shows that there can be some migration of that number But it would be very minor Can we still rely on that 1.1 number? Yeah, I think you can If it's not a material change Okay, so we can I think you meant Biotech Yeah, the Biotech That's the German name And they have represented You can use that data as long as you show that it's representative of the product in the U.S. If you cannot show that, if it changes, then you can't use that data And I misspoke when I said that earlier There are things like, I don't know, your product brochure, I think That says, for example, polymer 1% Why isn't that, you know, things like that and other communications Why doesn't that give us some comfort That there's going to be a certain level of stability And that's the expectation And that's in fact what HealthGen tells the world Because it doesn't speak to the issue of infringement So polymer is a type of aggregate But the most common type of aggregate is the dimer And so all that stability testing doesn't address the dimer percentage in the sample And so you have all these brochures and things like that That talk about other properties that they keep trying to cram into the aggregate percentage And it's just not, they just don't fit there You need to measure the aggregate percentage And the aggregate percentage materially increased by the time it got to the United States So now, does that... When you say materially increased, it didn't go above the 2% Which is the issue, and the ITC found that The commission found, even if it increased It was not proven that it increased above the 2% Which is the meaningful demarcation line here It only increased to 1.81 So even if it increased, it didn't go above 2% I don't see how I find that conclusion by the ITC lacks substantial evidence Well, because it's based on a test The test can show there's at least a certain amount of aggregation that occurs But it can't show the total amount of aggregation that occurred And this goes to your question, Judge Murphy The second part of the argument, which is When you are left with only the reducing SDS page data in the record Can the ITC rely on that to show the total amount of albumin in an unmodified sample? And you can't, because their own expert, their own people agree That that test, that reducing SDS page test Is not appropriate for measuring total aggregates And I think it's important to point out The commercial products for the parties They don't use reducing SDS page to measure total aggregate They use this HPLC test And their CEO admits this at 12.50 in the record, 12.51 And the reason is, their own scientist testifies Is the SDS page, the reducing SDS page test Cannot give you information about the level of aggregation Because it deliberately destroys aggregates before the test is taken I guess the question is We don't have any hard evidence in this record As to how much, you know, breaking up of aggregation is going on For either of these reducing SDS page tests that occurred I think in 2021 Either that got the 1.81 number Or got generated the 0.64 number And so, I don't know Clearly different reducing agents were being used But it very well could be that the 1.81 number Had very little disaggregation that occurred Maybe the most minor, de minimis amount And so if we're left with uncertainty That's a failure of proof I know, but I guess what I'm thinking about this case perhaps Is that the reducing SDS page tests At most could just be corroborating evidence Of what we already have With the SEC test that took place in China That got us the 1.1 number And then, you know, a basket of other information That suggests these things are pretty stable Especially when they are shipped and stored Under very specific conditions That your, you know, brochures indicate That yes, we do ship and store these things In these very kind of specific kind of conditions To ensure stability And so at most, the reducing SDS page Is just yet another test done That also ended up with something under 2.0 And therefore needing to claim them Except that the only thing That the reducing SDS page test can reliably show Is that that aggregate content Definitely increased between China and the United States It can't be used for any other reason It can't be used to show a minimum amount Of aggregation Because it destroys so many aggregates And obviously you understand that But the problem is The one thing you can know from that test Is that test in China is no longer accurate By the time it gets to the United States Now I'd like to, if I can Turn to the domestic industry issues And I think first we need to recognize How Venturia got to the place Where it needed to argue That a product whose investments Were so tiny both in absolute terms And as a percentage of their total spend On recombinant HSA products Is a significant or substantial investment In practicing the patent It's not necessarily crazy Because the statute says That the ITC should protect the domestic industry That is in the process of being established So it's not crazy that it would be a small industry And this is in hindsight In their briefs That's exactly what they're arguing That this is a new product That you can't expect the sales to be all that great The investments to be all that great Because it's in the process of being created The problem is The ITC requires you to plead that In the complaint They never pleaded it in the complaint They waived it then They never argued it at the hearing They waived it then And so that, I agree That is the way they end up arguing the issue They cannot argue that issue on appeal They cannot sandbag us With that argument on appeal Because the rules just don't allow them to do it Does it make a difference As to what evidence would be marshaled? Yes, it makes a big difference The whole economic theory is different The statute provides these very specific things That you can show In order to show that a domestic industry Had been established By the time they filed that complaint And that's what they chose To go forward with Because they thought they were going to have A whole stable of five products All these acres in Kansas and Colorado The problem is they're stuck with this You don't dispute that they've commercialized This patented product, right? I don't dispute that they've commercialized it They've been in the marketplace for Since, what, 2018? And all the engineering happening in the United States All the manufacture happening in the United States All the marketing is happening in the United States I mean, I guess what I'm wondering is What more do you want from Ventria to do In the United States When they are doing everything in the United States And have an actively commercialized product Because the statute requires more Than just it be generated in the United States The domestic spend is assumed in the statute They don't even begin to get in the door At the ITC without that But they need to show That it's significant or substantial Those investments are significant or substantial So they need to do something more So this is where Just the fact that they're in the United States That's not enough There needs to be something more So what the ITC grasps at To show something more Is this investment to revenue ratio Which, whatever relevance that could have In another context Like, for example, with the small sales It's a beginning product It's in the process of being created Yes, then maybe you can say Like these tiny sales In contrast with the investments or whatever The problem is the way it was done here It was just unthinkingly assigned Okay, investments to ratio We did it in other cases Investments to revenue Okay, counsel, but I have a question Significant or substantial As compared to what? If it is the entire industry I'm just going to call it OPTI Because I like to shorten names of things But if we're going to call it OPTI As opposed to all RHSA products If the market is OPTI Then this is a substantial and significant portion Of that market It may not be a substantial or significant part Of all RHSA products But it is a substantial and significant part Of the OPTI market Well, you can't just reduce the market To a single product And maybe need an attempt To show the market But you can Because in the ITC Unless I'm mistaken You can only pursue this When things are covered by the claims And it's clear Everyone agrees The claims cover OPTI It's also clear That they don't cover all RHSA products So why can't the ITC Look at the claims Ascertain what market Would be within the scope of those claims And then determine Whether the market Within the scope of those claims Which in this case is only OPTI Is definitely not all RHSA products Is a substantial and significant market Why can't they do that? That's what they did here That feels right to me What's wrong with that? I don't think that's what they did here They didn't look at the market for OPTI Am I wrong? Am I wrong in anything? Forget about what they did Am I wrong in anything I said? Isn't it correct That not all of the RHSA products Would fall within the claims? That is correct, right Isn't it also correct That the OPTI does? Yeah, yeah We don't dispute That it falls within the claims The problem is This is not the theory They pursued at the level But isn't it also the case That the ITC Is only supposed to look at The things that fall within The scope of the claims I don't think that's true I mean it's a pretty holistic analysis And that's something That they can look at It's part of what they can look at But they need to look at The investments, right The investments are the most important part That's what the statute says But the investments in the market For what's covered by the claim Right? I mean that's what this is all about It's all about excluding products Covered by the claim I don't know that that's correct I don't know that the market Is defined by the patent I'm not familiar with cases That hold for that What proof do you have That that's not correct Is there a statutory site Is there something in the rules Is there case law I mean you're an ITC lawyer, right You are telling me That you think That my understanding Of what the ITC Is supposed to do I.e. focus on a market That is covered by the claims Is wrong So I would think That there would be Something out there To show me that that's wrong I'm out of time But let me just address You're way out of time The issue is The statute says You look at investments You look at whether They're substantial Or significant And there's nothing in there About percentage of the market Or size of the market Is there anything in there About it being focused On what's covered by the claim In that statute Anything? I That it's I I Okay How about you take a look And I'm going to restore Some of your rebuttal time And maybe you can answer That question on rebuttal I just have one last question I'm sorry So I  How would you change the facts To satisfy you That there's a domestic industry here I mean what would it take You're not satisfied With their investment numbers right now But what would it take What would the What's your number What's your favorite number That makes you feel comfortable That the investments And labor capital Plants R&D Is finally significant enough I So It It I I  I      I I  I I I I   Am Not On part On part       On part Part Part On part Part I I I                     Option   Option Option Option Option                      I'm just asking because on appeal you're arguing that Optie was too small of a market. It wasn't right for them to limit the domestic industry market to Optie, right? Isn't that your argument? The investments are tiny. The market, nobody ever looked at the market for Optie because it was never raised below. If it's all, you can't say they're tiny. If this is the correct market, if the correct market is Optie and it includes all of the investments in Optie, then I don't know that it matters that it's a small numbers problem if it's 100% of the market. Your Honor, you're making an argument for them that they never made below. No one ever talked about the market for Optie in this case. I feel like I'm way beyond. The market for Optie, you just injected something into this case that nobody's ever talked about. Isn't that what the ITC found? No. What did the ITC find? Well, first, most of the analysis, mostly ALJ's analysis, is based on the products, the fixed products that they talked about, and the investment for all fixed products is significant. I mean, all the arguments on appeal are 100% of Optie investments are domestic. 100% of the value added to Optie is domestic operations. Optie's investments are significant and substantial when compared to the revenue derived therefrom. All of the arguments on appeal, it seemed to me, are focusing on the domestic industry being focused on just Optie. Am I missing something? So, it was never argued like that below. The ALJ's primary finding was all fixed of these products satisfy the domestic industry prong, and then there was, but even if only one of them does, I still find they're significant, and that analysis is really brief. That analysis has nothing to do with what you just talked about. The analysis says 100% of the investments... I'm going to help you out again. My clerk, who is super smart, says the ALJ found that even if the domestic market was just Optie, and not all six are HSA products, there would still be a domestic industry, and the ITC actually affirmed that exact finding. So, what? I don't get it. Because when you look at the investments, the raw numbers, this court has said, you need to look at the quantitative value of the investments first, and those numbers are so small. And then the investment, the only thing beyond those numbers is the investment to revenue ratio, which in this context just had no real meaning. All right. Well, let's hear from opposing counsel, and I'll give you a little bit of rebuttal time. Thank you. And double check the gray brief, because it seems like your arguments are really out of sync with what's in your gray brief. Thank you, Your Honor. Okay. Which one do you represent? I represent the commission. Okay. You're the ITC person. Okay. Go ahead. So, just want to clarify something to begin with. I'm going to start with domestic industry. The Optie product, that is a clinical grade product, and it is Venturi's only clinical grade product, and it competes with HealthGen's clinical grade product. So, there's two products that are in the same market, and they're the only two products in that market. And they both are Optie. They're not other R-H-S-A? Yeah. So, they're rice-derived recombinant human serum albumin products, and they have lower aggregated albumin amounts. Under 2%. It's way under 2%. We'll get to the infringement piece separately. We'll get to that. But they're the high-quality stuff. They have less for both sides. Well, then help me understand this domestic industry thing, because I might be mixed up. These are small numbers in the scheme of the kinds of numbers we normally see. I know they're confidential, so we won't get into the actual numbers themselves. How do we assess? How does the ITC assess what is substantial or significant, which is what you're required to do in assessing domestic industry? Especially when Lalo, our president, says you need to do a quantitative analysis to determine domestic industry, the economic problem. Okay, so there's two questions here. Start with mine, because I'm the chief. It's the same question. And ladies first. Go ahead. It's contextual. You have these numbers, but there's not just a number that you can say this is big enough or this is small enough. I think you're getting onto something. This is a niche industry, but this represents the entire industry. This is it in the United States. HealthGen has no domestic operations. Ventria is the only domestic producer of Opti. This is the entire market. Okay, so now you're touching upon that argument that I was discussing with opposing counsel about how does the ITC define what the market is, right? Right. You saw I was pushing for the market as you all defined it, I thought, as Opti. Right. We agree with you. Okay. And I think, if I'm not mistaken, his suggestion was it shouldn't be limited to Opti. It should be all our HSA products. Is that your understanding? No. It sounds like... We agree with you and your clerk. Well, that's a good thing. The statute is related to the articles protected by the patent and also says domestic industries with respect to the articles protected by the patent. So that's here, that is Opti, and that's only Opti. I'm just flummoxed by how we've converted this case into something called Opti. But to answer... Counsel suggested that this way of approaching domestic industry was never raised at the ITC. Oh. What's your response to that? No. It was very clear in our analysis that this is an industry where 100% of the investments in Opti are domestic, 0% is foreign. 100% of the value added is domestic and 0% is foreign. That was... This is analysis that LELO explicitly approved. And friends on the other side don't respond to our argument that these are analyses that LELO approved comparing the foreign to domestic investments and the foreign to domestic value added. And that's very qualitative. It's not qualitative because all can be rephrased as 100%. There's... This industry is as big as it can possibly be. I think if... I'm understanding that your point is that we should understand LELO and its push towards qualitative analysis as including percentage of market, not just raw dollar value. Its assessment of qualitative was not limited to how much money is at stake, but could also be viewed through the lens of what percentage of the market is represented. Exactly. That's how we read LELO. That's how we apply LELO. Let me make sure I've got the same understanding as LELO. LELO demands a quantitative analysis, right? Right. Okay. And then the next question is how do you go about doing a quantitative analysis? Do you just look at the raw value number of investment dollars, say, in R&D or not? And you're saying, no, it's got to be contextual analysis. Then the next question is how in the world do you go about doing that? So obviously what has happened here is that the ITC has said, okay, we're going to look at the amount of domestic commercial activity against the amount of non-domestic commercial activity that has taken place to create and sell this product. And it turns out that nothing's happened abroad. Everything has happened here in the U.S. The low number of dollars, relatively low number of dollars it took to engineer this thing and do the labor to create this thing alone doesn't render this thing a non-domestic industry. And I guess my question to you is, is that enough? Is it enough that everything is domestically sourced even if the numbers are tiny? What if there was no additional labor costs? What if there was no plant or equipment needed beyond the already existing plant and equipment a company had and the R&D could be fairly characterized as taking no more than $1,000 to create this new product that they then patented? I mean, it was all just the incredible insight to invent something, but in the end the amount of actual raw dollar investments are as tiny as $1,000. But nothing happened internationally. It all happened here in the USA. Is that enough to create a domestic industry with nothing more? Could the analysis be cut off just right there? I think yes. If you're commercializing products and you're actually producing something and you're bringing it to market, in the context of things, it would be like punishing efficiency. You have a very, very efficiently operated industry that doesn't use a lot of dollars but is providing a lot of products that people need and are serving very important purposes. It's if we apply a reality to the marketplace analysis. How do we know that's what the terms significant and substantial are getting at in 337? That it's, in your view, this pure, let's just look at what's happening domestically in a financial way versus what's going on non-domestically in a financial way to create this product? So we're looking at protecting domestic industries. We think that von Klemm decided this issue a long time ago when the court said that it doesn't protect only large industries. It protects industries of all sizes. It said something more like there's no dollar value requirement to establish a domestic industry or something like that. I remember it differently. It said there's no minimum size to invest in an industry. Can you pivot? I mean, you're almost out of time, but will you let him go way over? So I'm going to give you a little more time, but I'd really like to hear your arguments on the infringement question, if you don't mind. Is that okay? Do you have anything else? Thank you, Your Honor. I appreciate that. So all of the testing data shows infringing amounts of aggregates. And substantial evidence, of course, commissions reliance on this data. The 1.81% number makes me nervous. I mean, that's a big move from 1.1 in a period of less than one year, maybe eight months. And that's with a reducing SDS page where you're adding the surfactant, you're adding the reducing agent, and you're getting something that's getting really close to 2.0. How should I think about that number? So I think you should look at it in context with a test that was done just a month before that shows 0.64%. And if you look at those numbers. Maybe that's just a heavy-duty reducing agent in there that really broke things up. Okay, that's fine, but we still have the reality of a 1.81 number staring us in the face. That, I think you would agree, would necessarily be a lower number than if HECHPLC were used as the test. So I think what's getting overlooked is the reducing effect only happens if there are these very particular types of aggregates. They are disulfide-linked covalent aggregates. And HealthGen's argument is that if their sample has these type of aggregates, then a reducing agent would undercount them. And we don't disagree that there would be some undercounting if there are those aggregates, but we don't think that there is any evidence showing that they have those aggregates. Their other products, their medium-grade products, they ran a test using a reducing agent. Then what about the 0.64 number? Doesn't that evidence something? There's variability in these measurements. Dr. Wilkin testified that there's some degree of variability that's expected for these measurements. And there's no same-batch to same-batch comparisons. We're dealing with different batches, right? Is any of this data where you have data in China and data domestically the same batch? The three main tests that were relying on the COA from September and then the April and the May and the June reducing tests, those are all the same batch. Would you concede that Appellant's basic logic is correct? I was referring to the demonstrative with the question marks in the middle. The basic logic that that question mark number must have been higher than 1.81%. We just don't know how much. Would you agree with the basic logic? I don't think they've shown that there's any disqualified covalent aggregates in there. If there are, then I would agree with you. Okay, well, let's just assume that their logic is correct. The response that I got from them was, okay, now the burden is on the patent owner to show that those question marks were not over 2%. How do you respond to the burden issue? Are you asking about whether it was Ventria's burden to show that it's more likely than not that their argument challenging the reliability? Appellant's saying all they had to do was point to these question marks and say, hey, you don't know what those numbers are. It could have been over 2%. There's a rational reason to think they were over 2%. That's a failure of proof. We think that Ventria satisfied their prima facie case by presenting this testing evidence. And if we're going to discount it, there needs to be a good reason why. But even if that's not the proper standard of evidence, the evidence is very strong that this testing is reliable. The evidence related to HealthGen's touting of a stability that's still into play here, they say these are very stable products. It just contradicts the point saying, well, it went to 1.8% within a year. They're saying it went well beyond 1.8%. They're saying it's 2 to 3 times higher than that. That's almost 7%. Can I ask another question? I'm not sure where it is, but I think that the ITC held this, found it, I should say. I remember there being, and my clerk's looking for it now, but I remember there being differences in the conditions under which these two sets of tests were run. I have in my brain the number five. I don't know if that's right. Good memory. Okay, I have her looking for where it is, and I don't remember. Did the ITC find, and I thought they had, but I don't remember. We did, yeah. That is one rationale for just evaluating these results and just not being concerned. And so we're reviewing this for substantial evidence, so regardless of those question marks on his demonstrative, the ITC made a fact finding that it is possible that the differences between these numbers, did they find that it was a result of those five? It's possible, what did they find precisely? The different conditions under which the tests were run. We found that it's not very concerning that these numbers are different. We looked at the data overall. You have September, the first one. You have May won this .64, and then you have later won this .81. It all seems pretty consistent. We found that overall it's more likely that infringing products were imported into the United States. Because they're all under 2%. They're all under 2%, yes. Okay. Okay. Anything further? Okay. Let's give the other defendants, or appellee, a chance. Thank you. May it please the court. My name is Tom Hennigan, and I represent intervener Venturi of Bioscience. Venturi is a pioneering American biotech company. Okay, stop. We've been here a long time. Everybody's exceeded their time already by a lot. If you have something new that isn't puffery, just to injure yourself or your client, then focus on that. But I do not want to hear any regurgitation of the exact issues and arguments that have already been raised. Understood, Chuck. Let me start with the use of the phrase Opti, because I think that maybe could be a little confusing. OptiBuhmann is actually the brand name of the Venturi product. So I think maybe an easier way to think of it is the market is the clinical grade. Opti is a really cute name. Don't be disdaining my little abbreviated name. I don't mean it as a disdain. I get it. No, thank you. A technical clarification is welcome. And in this market for clinical grade RHSA, there's only two products. There's Venturi's product, and there's Wuhan Health Gen's product. So that is the entire market for this commercialized product. And I think that's an important distinction, that they are the only two, which is why we focused on that. Can I ask a question for you on the infringement side?  There's a suggestion under the biotech case that the data from China combined with the expert testimony about shipping conditions, that alone can't carry the day. That can't be substantial evidence for infringement. How do you respond to that? Forget about the domestic testing. Okay. What I would say about that is that calling the shipping information evidence is a little bit of a stretch. The idea that somehow the aggregation is increased in shipping was really just a lawyer argument. And it wasn't proven that that could happen. Certainly, Wuhan Health Gen had the opportunity to test that same batch that they tested in China and found it. I understand, but what they're arguing is under the biotech case, it's not sufficient to rely on evidence of the testing overseas. You have to have direct evidence crossing the border domestically. Do you disagree with that? I do disagree with that, because I think what the case says is that if you have contrary evidence, then you can't rely on the foreign testing. And here what we have is we have the foreign testing that shows infringement. Then we have the shipping to the U.S. where it's in Wuhan Health Gen's possession for a period of months before it's then turned over to Venturia for further testing. And then there's just this theory that it must have gotten shaken up on the flight over. But there's no evidence of that. Well, the number, the reducing number is higher than the number was in China. It is a bit higher, but it's still within the frame of the... But it is evidence that there is aggregation that happened with this batch. Yes, but the question is how much. I think you would agree that the amount of aggregation increased on the order of 70-80% when it went from 1.1 to 1.81, and that 1.81 is with reducing STS-K. But reducing STS-K... I just want to make sure we're all in the same place. Do you agree that this particular batch that was tested three different times, the aggregation definitely increased on the order of at least 70-75% from 1.1 to 1.81? It did, but still within the element of the claim. So it's still infringed, even though it increased slightly. No, it's not slightly to me. I mean, when you go from 1.1 to 1.81, I mean, percentage-wise, that's a pretty incredible amount of change to the amount of aggregation going on for those algorithms. But it comes down to the question of does the product infringe when it's in the United States, and it does. It's still within the claim element of less than 2% aggregated algument. And there's no evidence that reducing SPS-PAGE had any impact on that aggregation. And so what we know is that it infringed when it left China, it infringed after it was here, and it continues to infringe. This particular batch, when did it arrive in the United States? I'm not sure of the exact date. It arrived in the United States... I don't want to speculate, Judge. I don't know the exact date of when it arrived. But shortly after it was tested and manufactured. How do you understand what quantitative analysis means for purposes of the economic problem? I think that there are a couple elements of it that apply in this case. One, I think, as you pointed out, this idea of how much activity happened in the U.S., how much activity happened elsewhere. In this case, it happens to be 100%. And I think when you couple that then with an actually commercialized product that was brought to market, I think that is a successful quantitative analysis to show a domestic industry. That this American company invested however much they invested, however much it took. And I think it's also important to point out that one of the reasons this number is what it is is because it was a sales-based allocation as opposed to an actual allocation of the investment because Venturi did not separate the amount of money they spent in developing all their products. So they can't say, we spent exactly X millions developing just Octobuman. They can only talk about what they spent developing all their products because the accounting didn't work that way. In certain stringed instruments, the ITC opinions, was that product there ever commercialized? My understanding was not. There were several different prototypes over many, many years that were never brought to market. And I think that's a distinction for the stringed instruments case, is that that was never a commercialized product. I don't understand the investments to revenue ratio. It feels very random to me. Could you explain why that ratio that the commission used is in fact relevant to how to understand whether investments here in R&D or labor or capital supports the idea of a substantial investment? Because right now, I don't get it at all. It's random.  Well, I think the problem with that ratio is that it's impossible to determine exactly what the investment was in Octobuman because that was not money that was tracked. That doesn't seem to help your case to say that. Well, it doesn't help us, but it also doesn't hurt us. Well, then how can it be relevant for the commission to use it? Well, I don't think that the commission based their opinion on that ratio. I think they noted it as sort of correlating evidence. What they didn't, it wasn't the basis of their opinion. The basis of their opinion was the sale-based allocation approach. One of the questions that was asked in the beginning of the argument to your opponent was what about the fact that the statute says you can focus on an industry that's in the process of being established. Certainly, that investment to revenue ratio would be relevant to that issue. But what I understand from your adversary is that he says that you would have had to have plead or pled this in the process of being established industry thing. That wasn't something that was part of the case below for the ITC. Is that correct? No, that's not correct. It was part of the case below. In fact, our economic expert testified about that and was cross-examined on those points. So, it was part of the case below. We pointed that out in our brief as well. Did the ITC make any findings related to whether this is an industry in the process of being established? Either the ALJ or the commission, did they make findings about this being an industry in the process of being established and use any of this data in that way? The ALJ definitely made that determination, Judge. Now, off the top of my head, I can't tell you if the ITC specifically made that finding. I apologize. Okay. The ITC, at one point, said this is a two-competitor market. A two-competitor market? A two-competitor market.  And that HealthGen's product is much cheaper by gram than your opt-in unit. Right. And that's a factor in our sale-based allocation. Our sales are not as robust as they could have been because of the anti-competitive behavior of Wuhan HealthGen. One of the reasons the numbers are what they are is that Wuhan HealthGen has undercut our market because they're the only other competitor and they are pricing it well below. Going back to my revenue-to-investment ratio question, you don't really have the rationale we can offer the court on why that's a legitimate way to think about significant or substantial investments? It sounds like you're kind of blowing it off and saying, don't worry about it. It doesn't matter. I'm not blowing it off, Judge. What I'm saying is that in this particular situation, it's difficult to have an exact number in that regard because we can't separate out all the expenditure that we can develop on it. The Commission used it. The Commission definitely used it. They did. I'm asking you to explain whether you can support the Commission's partial reliance on it. And right now, I'm hearing nothing. Well, I guess, and I apologize for not being fair. Because you've been trying to avoid it every time I ask you about it. So is there an answer or not? I apologize. That's not my intention to avoid it. So then tell me a good reason why it actually is rational. It's rational because there's no question that Ventria spent money to develop the optimum product. But it wasn't able to carve out exactly the amount it spent on that particular product. So therefore, the ratio cannot be exact. But there's no question that all this pre-launch, pre-commercialized work was done. My question is different than your answer. I'm sorry. My question is just the entire nature of using this ratio. I think the ratio is totally appropriate to use. Why? Because it demonstrates what a domestic company is doing to bring a commercial product to  And so therefore, that ratio is a valid way of measuring whether or not quantitatively the domestic company is actually doing what it needs to do to establish a domestic industry. Or maintain a domestic industry. Or maintain a domestic industry.   Okay. Thank you, counsel. I would just like to make one very, one sentence point about the No commas. No commas. Go ahead. Okay. Just I want to point out that reducing SDS-PAGE is actually the quantitative methodology that's in the patent. So I just want to make that point. Thank you. Thank you. And you can have all of your rebuttal time back. They went over. So I'll give you all your rebuttal time back. But I certainly think they went over less than you went over the first time. But all your rebuttal time back. I appreciate that.   So let, the last point. Let me get that first. It doesn't describe reducing SDS. The patent doesn't reduce, doesn't describe reducing SDS-PAGE as the way to measure all the albumin aggregates in the sample. It describes measuring one type of aggregate that is at 270 kilodaltons molecular weight. HPLC is described as being used to measure the dimer content in the same column, in column 7.2 in the patent. So let's go back to the domestic industry, Your Honor. The only definition of a market that we could find while we were sitting here at council table is the market for rice-derived HSA. We could not find any specific reference to a market just for optobumin. And here's why you can't look at it that way. It's because if you looked at it that way, if you looked at the market as being just the patented product, you would always have significance using this analysis. Because let's just say you invested $100 into a product and you sold $100 worth of the product. The market as defined that way is the market for the patented product. And so you've got 100% investment revenue ratio. Would you agree that it is appropriate for the ITC to recognize a domestic industry in a small market specialty good sometimes? I think under the right circumstances you could make that argument. What are those circumstances? Sitting here, I think it's just way too complex of an analysis to start in a startup. I think when you've got, remember the statute requires an established domestic industry at the time the complaint is filed. What you're describing is in the process of being created. That is something that's there for them to do. Now I'm focused on just a small market for a specialty good, a market segment. Yeah, I think that if you define the market a certain way and there's a reason to define the market that small. But you can't just do this circular thing like investments in the patented product divided by the market for the patented product. Because you will never have a situation where you don't end up with 100% in that circumstance. I can't recall, in your bluer gray brief, did you say it's wrong for the commission to be octogumen focused in understanding what is the domestic industry here? Because it didn't focus on just octogumen. It talked about the market for all the products together. It never really talked about the specific market. There's something about the commission though. The commission sort of sidestepped all of the products and just focused down on the octogumen. And concluded we like what the ALJ said given that everything's happening in the US. And what the ALJ said just talked about the investments into octogumen. And those were significant. And just one last point on the investment to revenue ratio. It is contrived, especially because the product specific investments here were calculated in a way that makes that investment to revenue ratio irrelevant. Because in order to get that product specific investment number, you need to multiply by the product specific revenue. And then the ratio requires you to divide by that product specific ratio. And you've just eliminated any influence that the specific product has on that number. So there's all kinds of reasons why that investment to revenue ratio is irrelevant. Thank you, counsel. We need to cut this off. I thank all counsel for taking under submission.